FILED

2006 Mar-27  PM 03:17
U.S. DISTRICT COURT
N.D. OF ALABAMA



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| DIANA CROFT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 02-B-0169-S |
| | ) | |
| SCI OF ALABAMA, d/b/a Funeral | ) | |
| Services of Alabama; SERVICE | ) | |
| CORPORATION INTERNATIONAL, | ) | |
| d/b/a SCI; | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendants' Motion for Summary
Judgment. (Doc. 93.) Plaintiff Diana Croft has sued her former employer, defendant SCI
of Alabama,[1] and its parent company, SCI, alleging state-law claims of fraud, mistaken or
innocent misrepresentation, breach of contract, misappropriation of trade secrets, and unjust
enrichment.[2] (Doc. 78.) Upon consideration of the record, the submissions of the parties,
the arguments of counsel, and the relevant law, the court is of the opinion that defendants'
Motion for Summary Judgment, (doc. 93), is due to be granted in part and denied in part.

---

[1]SCI of Alabama's correct name is SCI Alabama Funeral Services. For purposes of
this case, the court will refer to this defendant as SCI of Alabama.

[2]Plaintiff's Complaint also contained claims of discrimination and retaliation in
violation of Title VII. (Doc. 78.) These claims were dismissed on the joint stipulation of the
parties. (Doc. 92.)

# I. <u>SUMMARY JUDGMENT STANDARD</u>

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255. Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. <u>STATEMENT OF FACTS</u>

### A. DIGNITY MEMORIAL PROGRAM

In 1994, Gerald Pullins, then Senior Vice President of Corporate Development for SCI, moved to England, when SCI acquired two operators of funeral homes in the United Kingdom – Great Southern Group and Plantsbrook Group. (Def. Ex. Q ¶¶ 2-3; Def. Ex. W at 12-13.) After acquiring the two operators, Peter Hindley became Managing Director of SCI-UK, and he reported directly to Pullins. (Def. Ex. Q ¶¶ 2-4.) As Managing Director, Hindley was responsible for all funeral operations in the United Kingdom. (*Id.* ¶ 4.) He hired a marketing consultant, Dr. Alton Doody, "to review the then-existing marketing of funeral goods and services within [SCI-UK]." (*Id.* ¶ 10.)

Based on his assessment of the marketing situation, Doody, working with Pullins and Hindley, implemented a marketing system for the funeral services based on the "good, better, best" concept of marketing. (*Id.*; *see also* Def. Ex. GG at 49.) This concept was used in developing written marketing and sales materials related to packaged funeral plans. (Def. Ex. GG at 59-60.)

> Each of [the funeral plan] packages was illustrated by photographs of the coffins available, with a listing of related goods and services, such as transport of the body, preparation and care of the body, the casket selection, visitation, hearse and/or family car, and staff services for dealing with the body, the family and the visitation.

(Def. Ex. Q ¶ 14.)

SCI-UK implemented the "Good-Better-Best" packaging strategy and, in mid-1998, introduced three funeral package plans under the name "Dignity." (Def. Ex. Q ¶¶ 12, 14; Def. Ex. GG at 91-92). In 1989, the Plantsbrook Group had registered the "Dignity" name as the brand name of its funeral packages. (*Id*. ¶ 15.) Pullins expanded the use of the Dignity name brand to SCI in France as Dignité. (*Id*. ¶ 16.) SCI developed a logo with trees and added color to be used in conjunction with the packaged funeral plan program in Europe. (Def. Ex. W at 51-52.)

Pullins returned to the United States in November of 1998, as Executive Vice President of International Responsibility. (*Id*. at 16.) Later he was named Senior Executive Vice President of Operations and he was responsible for domestic and international operations. (*Id*. at 33.) In 1999 or 2000, he was named President and Chief Operating Officer. (*Id*.)

Pullins testified:

[W]hen I was in Europe we had taken a . . . very, very modest approach to marketing the funeral and related merchandise, and [had] begun a packaged funeral plan development, and it was extremely successful in both the UK and France. . . . And by packaging and marketing coffins and funeral merchandise, we were able to increase average sales about 50 percent in two years.

(*Id*. at 38.) Because of this success, Pullins intended to use packaged plans in the United States; he said:

[T]he decision was made to take the concept that we had in Europe and had had pretty good success in increasing revenues and enhancing profitability and introduce that concept here. And that concept included presenting consumers

4

with the ability to select better quality, and creating packages that included
different items than had heretofore been offered by funeral homes in the
United States.

(*Id*. at 69-70.)

Michael Rybarski became Chief Marketing Officer for SCI in March 1999.  (Def. Ex.

X at 10.)  As Chief Marketing Officer, Rybarski oversaw the task of initial implementation

of Dignity Memorial in the U.S., including putting together a team to work on the project.

(Def. Ex. W at 82; Def. Ex. T at 21; Def. Ex. S at 90; Def. Ex. AA at 108).)[3]  Rybarski saw

the Dignity concept as a "branding concept," and packaged funerals were a part of that

branding concept.  (Def. Ex. X at 36-37.)

By July 1999, the "key aspects" of the Dignity Memorial Plan were established,

including the good, better, best concept of the packages.  (*See* Def. Exs. N and O.)  No one

involved in the creation of the Dignity program in Europe or the United States, except Ken

March,[4] knew Diana Croft or had ever heard of her Millennium Funeral Concepts ["MFC"]

---

[3]Rybarski testified that he created the idea of Dignity funeral packages.  (Def. Ex. X
at 27.)  He  testified, "I think I came up with the concept.  I think it was something that was,
again, a result of the research we did that basically – it was a solution to a problem.  And it
was my solution . . . ."  (*Id*.)  However, he admitted that Dignity was the brand name used
in Europe before the brand name was used in the United States.  (*Id*. at 26.)  He also admitted
that the funeral package concept had existed in the UK, although he did not use the UK
packages because "we were pretty far down the road in developing the Dignity packages
when [Pullins] brought awareness of what was going on in Europe."  (*Id*. at 32-33.)

[4]As National Sales Manager of SCI, Ken March was on the development team in the
United States; however, nothing in the record shows that he played any active role in the
creation of the program or that he added anything to the program of any significance.  (Def.
Ex. HH at 143, Def. Ex. X at 78.)  March testified that he was not directly involved in the
creation of Dignity, but he had been consulted and knew what was going on.  (Def. Ex. HH

program, and each testified the MFC program played no part of the development of the United States Dignity program.  (Def. Ex. Q ¶ 18; Def. Ex. T at 114; Def. Ex. U at 116-18; Def. Ex. W at 173, 175; Def. Ex. X at 14-15, 143-44; Def. Ex. EE at 58; Def. Ex. GG at 171-72).

The funeral industry had sold funeral packages, where a group of goods and services were sold together with a single price, prior to the creation of the Dignity packages.[5]  (Def. Ex. V at 155; Def. Ex. DD at 92; Def. Ex. Z at 36; Def. Ex. CC at 40-56; Def. Ex. Y at 107.) SCI had sold funeral packages, which included grouped goods and services depicted by photographs, prior to the development of the Dignity packages.  (Def. Ex. V at 155; Def. Ex. DD at 92-95.)

_____

at 143.) Rybarski testified, "[March] provided feedback as we were developing the concept. It was more of a marketing strategy product.  We would show him where we were going to make sure it worked with the pre-need sales side . . . ."  (Def. Ex. X at 78.)

[5]The court notes that, in 1982, the FTC enacted the funeral rule, 16 C.F.R. § 453, "to prevent *package pricing* by funeral homes," "[b]y requiring itemization."  *Craigmiles v. Giles,* 312 F.3d 220, 227 (6th Cir. 2002)(citing 16 C.F. R. § 453; 47 Fed. Reg. 42260, 42260 (Sept. 24, 1982)).  In 1982, the FTC found:

> Statistics from funeral trade associations demonstrate that over half of all funeral providers use some form of package or lump-sum pricing.  . . .

> The widespread use of package pricing is partly explained by the industry's belief that it is simpler for consumers to use, that it is easier for funeral directors to use in determining prices, and that it enables funeral directors to make full traditional funerals available at a lower price.

47 Fed. Reg. 42260, 42267.  Packaged funeral goods and services is not unique to either MFC or Dignity.

Beginning October 18, 1999, the Dignity Memorial Plan was test marketed in Phoenix, Arizona, and Louisville, Kentucky. (*See* Def. Ex. K.) On that day, the SCI weekly bulletin contained the following item:

### Dignity™ Memorial Plan – Test Marketing Begins

On October 18, 1999, SCI launched the Dignity™ Memorial Plan in Louisville and Phoenix. Dignity is our exclusive name-brand selection of "packaged" funerals, with national prices that start at $2,495. Six tiers of funerals are available with multiple ancillary choices of service and merchandise available, which offers excellent consumer value, when compared to buying all components individually. As package prices increase, so do the lists of services and quality of merchandise. Cremation packages and cemetery merchandise are also offered. . . . We'll keep you informed of the program's progress in these test markets.

(Def. Ex. K.)

## B. DIANA CROFT AND MILLENNIUM FUNERAL CONCEPTS

Plaintiff, Diana Croft, began her career in the funeral industry in 1976 in Charleston, South Carolina as a pre-need sales counselor. (Pl. Ex. 6 ¶ 2.) In 1993 she began developing a standardized marketing program designed for the funeral industry. (*See id*. ¶¶ 6-9.) The program she developed, Millennium Funeral Concepts ["MFC"], was designed to be an all encompassing sales and marketing initiative designed specifically for funeral, cremation, and cemetery sales. (*See id*. ¶ 9.) She testified, "My vision was to eliminate the confusion for both sales counselors and customers by developing programs [that] could be used at any location for any aspect of the Funeral Industry." (*Id*.)

Plaintiff "worked on improving each phase of [MFC] from 1993 to 1997 while test marketing each change and improvement." (*Id*. ¶ 11.)  By 1998, plaintiff considered her program to be complete. (*Id*. ¶ 16.)

Around November 1998, plaintiff presented her MFC program to Mike Shipley, Vice President of Sales in SCI's Southern Region. (*Id*. ¶ 20; Def. Ex. Z at 14.)  Shipley liked plaintiff's program and asked her to show it to other SCI employees.  (Def. Ex. R at 89.) Shipley testified that prior to plaintiff's presentation, he had seen funeral packages with color pictures. (Def. Ex. Z at 19-21.)

On March 22, 1999, plaintiff signed a contract with Bill Williams, SCI's Area Manager for Pensacola, to implement her MFC program at the Memory Park Cemetery in Milton, Florida; Williams signed the contract with Shipley's approval.  (Def. Ex. V at 18; Def. Ex. Z at 12-13; *see* Def. Ex. A.)  The Milton contract provides, in pertinent part:

NON   EXCLUSIVE   END-USER   LICENSE   AGREEMENT   FOR *MILLENNIUM FUNERAL CONCEPTS*™ PROGRAMS

IMPORTANT – READ CAREFULLY: THIS *MILLENNIUM FUNERAL CONCEPTS*™ END-USER LICENSE AGREEMENT ("EULA") IS A LEGAL AGREEMENT BETWEEN YOU . . . AND *MILLENNIUM FUNERAL CONCEPTS*™ FOR THE *MILLENNIUM FUNERAL CONCEPTS*™ PROGRAMS WHICH INCLUDES RETAIL CLOSING BOOKS (including, but not limited to "THE MENU", SPECIAL PACKAGE PROGRAMS, SPECIAL MAGNETS), SALES CATALOGS, COUNSELOR HANDBOOKS,   SALES   JOURNALS,   SUPPORT   DOCUMENTS, TRAINING MANUALS, PRINTED MATERIALS, ASSOCIATED MEDIA, VIDEOS, COMPUTER SOFTWARE & ALL OTHER *MILLENNIUM FUNERAL CONCEPTS* COPYRIGHTED MATERIALS OR MEDIA ("The Program").  BY INSTALLING, RECEIVING, OR OTHERWISE USING THE MILLENNIUM *FUNERAL CONCEPTS*™ PRODUCTS AND

PROGRAMS, YOU AGREE TO BE BOUND BY THE TERMS OF THIS EULA.  If you do not agree to the terms of this EULA, do not use or take receipt of the *MILLENNIUM FUNERAL CONCEPTS™ PROGRAMS*.

. . .

## 2.  DESCRIPTION OF OTHER RIGHTS AND LIMITATIONS.

. . .

•     **Limitations on Reverse Engineering, Decompilation, and Disassembly.**  You may not reverse engineer, decompose, recompile, disassemble, reassemble or in any way restructure "**The Program**", except and only to the extent such activity is expressly permitted by applicable law not withstanding [sic] this limitation.

. . .

<u>*MULTI-LOCATION PROVISION:*</u>
*It is mutually agreed that the MILLENNIUM FUNERAL CONCEPTS™ Programs will initially be set up in Memory Park, Milton, Florida.  Within 60 days, Service Corporation International will contract with MILLENNIUM FUNERAL CONCEPTS™ to place "The Program" into all Pensacola, Florida Locations – within 120, all Mobile, Alabama Locations – within 180 days, it is mutually agreed, that Millennium Funeral Concepts™ programs will be given an opportunity to be presented to the Corporate Headquarters for consideration as a company wide Marketing Plan.  If Service Corporation International chooses not to put this Program on a national or international basis, Service Corporation will not attempt to violate any of the aforementioned copyright.*

(Def. Ex. A (emphasis in original).)

A condition of implementing the MFC program at Memory Park was that plaintiff become Sales Manager at the Milton, Florida facility.  (Def. Ex. R at 51-52.)   After signing the contract, plaintiff went to work as the Milton Sales Manager.  (*Id*. at 52; Def. Ex. Z at 74-75.)

9

Shipley testified that plaintiff did not complete the agreement for implementing MFC at the Milton location because she told him that "[s]he couldn't get it to work with all the price changes." (Def. Ex. Z at 80-81.) He testified that plaintiff told him that "it was just almost impossible for her to continue to have all the inputting that had to be done." (Def. Ex. Z at 74-75.) Plaintiff disputes she had any difficulty with implementing price changes, and she denies that she ever made such a statement to Shipley. (Pl. Ex. 6 ¶ 26.) Nevertheless, Shipley testified that he thought plaintiff was successful as a Sales Manager during her time in Milton. (Def. Ex. Z at 82.)

The Milton contract also provided that plaintiff would be allowed the opportunity to present her MFC program for use nationwide. (Def. Ex. A at 3.) Thus, Shipley arranged for plaintiff to meet with Ken March, National Sales Manager of SCI, in September 1999. (Def. Ex. R at 61.) Plaintiff met with March and presented her MFC Program for his consideration as a company-wide marketing plan. (Def. Ex. R at 62; Def. Ex. Z at 74.) Plaintiff testified March told her he was impressed with her program and told her, "[T]his is absolutely the best thing I've ever seen; you are way ahead of the industry; but we know packaging is where we should be; we could not have put a roomful of our best people together for several years to come up with something as complete and thorough as this program, and we want to have it at SCI." (Def. Ex. R at 62-63.) Shipley testified March told him he thought plaintiff's program had some positives. (Def. Ex. Z at 85-86.)

However, March testified that he did not remember plaintiff making a presentation of her MFC program, although he did recall looking at her production numbers.  (Def. Ex. HH at 153.)  He testified:

> Quite frankly, the position where I was in with the time limitations that I had, with the circumstances that I was under, I highly doubt that I would ever be able to sit down and look at a manual that thick with a sales counselor.  It just doesn't – it doesn't ring possible to me.

(*Id*. at 153-54.)  During his deposition, March was shown the MFC Sorting Guide, Tracking System, Contracts Tracking Log and Sales Report Notebook; he testified that he had been shown the material before his "eyes probably would have glossed over." (*Id*. at 156-57.)  He testified that plaintiff's materials were "highly complex" and "probably [would not] be used and probably won't work." (*Id*.  at 158.)  March testified that he met with plaintiff as a favor to Shipley. (*Id*. at 16.)  He testified he met with plaintiff to "help[ ] Mike Shipley to recruit somebody that he knew and thought could be good for [the] company," and he "had no focus on any [of plaintiff's MFC program] or desire to." (*Id*. at 159.)

Plaintiff testified that March told her he wanted her program, but she need a position of power to insure the program's success. (*Id*. at 64.)   She told March she was not interested. (*Id*. at 64-65.)  According to plaintiff, at the close of that meeting, March asked plaintiff to put together a proposal whereby SCI would have the "exclusive" rights to her MFC program, instead of the nonexclusive rights to use the program. (*Id*. at 63-64.)  He also asked plaintiff to develop a lead procurement program and report back to him. (*Id*.)

11

Plaintiff testified that when she left Houston, she left behind a sampling of her presentation catalog, which also included a plan for rolling out the program company-wide. (Pl. Ex. 6 ¶ 27.)  She also left behind all of the accounting information for her MFC testing results since 1993.  (*Id*.)

Following her meeting with March, plaintiff submitted a proposal for the "First Cluster 8-Cluster Roll Out."  (Def. Ex. H; Def. Ex. R at 67-68.)  The proposal set a $2,000,000 "exclusive contract fee."  (Def. Ex. H at 17.)  This agreement was never executed.  (Def. Ex. R at 69.)  However, plaintiff contends that March orally agreed to implement her MFC program nationwide on a five-year plan.  (Def. Ex. 69-70.)

Also, as a result of her meeting with March, plaintiff developed her Time Capsule program.  (Def. Ex. R at 70-71.)  The time capsule program was designed as a lead procurement program, where customers placed mementos in individual time capsules, which were then buried for 25 years or longer for eventual return to designated family members. (*Id*. at 70-71, 101-02.)  Shipley and March liked the idea of the time capsule program.  (Def. Ex. Z at 89, Def. Ex. HH at 27-28.)

In January 2000, Shipley asked plaintiff to show her programs to Vic Deacy, Area Vice President over the Birmingham locations, and Ernie Poynter, Regional President for SCI Funeral Services of Georgia. (Def. Ex. R at 92; Def. Ex. Y at 33, 37; Def. Ex. DD at 15.) Plaintiff testified that Poynter asked her why should SCI buy her programs when they could just steal them.  (*Id*. at 92-93.)  Poynter denies he ever said anything about "stealing,"

although he does admit that he said SCI would use a time capsule if it wanted to use a time capsule. (Def. Ex. Y at 58.) Plaintiff replied that she hoped SCI would not steal her program, and Poynter responded that they would see how much plaintiff knew about copyright law. (Pl. Ex. 6 at ¶32.) Shipley told plaintiff that SCI would not steal anything. (Def. Ex. R at 93.)

Shipley told plaintiff that she needed power in the company to ensure success of her program in the field. (*Id*. at 64-65.) She told him that she wanted to focus on her program and that she did not want to be a manager, but she would do what it took to get her programs throughout SCI. (*Id*.) She then accepted a promotion to Area Sales Director and she relocated to Birmingham, Alabama in January, 2000. (*Id*.; Def. Ex. Z at 278.) Plaintiff performed well as Area Sales Manager, (Def. Ex. Z at 105-08); however, she continued to question Shipley about when SCI would finally be ready to roll-out her MFC programs. (Def. Ex. Z at 113.)

Plaintiff testified that she and Shipley agreed to implement her time capsule Program in Birmingham effective in February of 2001. (Def. Ex. R at 146-49.) Specifically, plaintiff testified that she faxed Shipley a proposal for the time capsule program, which Shipley orally accepted. (*Id*. at 146-47.) Plaintiff has not submitted the proposal she faxed to Shipley in the fall of 2000, which she claims he accepted. Plaintiff testified that she believed a "signed contract" was "necessary," (*id*. at 149), and she prepared a contract for Shipley to sign in December 2000, (*id*. at 151-52). However, Shipley told her he was not going to sign the

contract and SCI was "never going to do any of [her] programs anyway, and [it was] not doing the time capsule. (*Id*. at 152-53.) Shipley testified that during this period of time SCI had "a spending freeze on all lead programs," and he "could not just go out and decide that [SCI] was going to spend money." (Def. Ex. Z at 221.)

Prior to the December 2000 meeting, Shipley had told plaintiff that he was going to "give portions of [her] territory to two other area sales directors that could do a better job." (Def. Ex. R at 143.) Plaintiff testified that she had become emotional, and "tried to get [Shipley] to table that discussion until [they] went to [her] office where all the records were of [her] numbers and to get back on the time capsule contract." (*Id*. at 144.) Shipley told her they were not going to talk about the time capsule program, and he told her, "[L]ook, all of this has gotten to be too much pressure on you. He said, maybe what you want to do is resign and go back to Florida and walk on the beach with your grandchildren." (*Id*. at 144-45.) Plaintiff told Shipley she would consider what he had said over the Thanksgiving holiday. (*Id*. at 145.)

In December 2000, Shipley came to Birmingham to meet with plaintiff; she described the meeting as follows:

> In the first week or so in December of 2000, following . . . Thanksgiving . . ., he came back to Birmingham . . . . So this meeting was to be about the time capsule and about whether I would stay as area sales director. When he got to my office in Birmingham, he said – I had the contract ready for him to sign, and he said I came here because you resigned your job. I said no, I did not. You suggested I do, but I said I would think about it. I said all I'm interested in is the time capsule contract getting signed. And he said he wasn't going to sign it.

. . .

He said you've resigned as area sales director.  And I said no, I have
not.  And we had a few words that I don't remember exactly all of the
conversation.  But I stayed focused on the time capsule and said, we have got
to do the time capsule.  And he pushed his chair back and said, okay, you've
pushed me in a corner; we were never going to do any of your programs
anyway, and we're not doing the time capsule.

( *Id.* at 151-53.)

On December 18, 2000, plaintiff wrote Shipley a letter, which stated that she was

resigning under protest.  (Pl. Ex. 20.)  She also stated that she wanted to ask March why he

told Shipley to stop the time capsule program "after [Shipley] led [her] to believe that [she]

should do it for the 4th Quarter campaign."  (*See id*.)  Plaintiff does not mention her MFC

program, which she now says March had orally agreed to implement nationwide on a five-

year plan, or the Milton contract in this letter.

Plaintiff left SCI on January 6, 2001; Dignity was released in the Birmingham market

on Monday, January 22, 2001. (Def. Ex. Z at 270; Pl. Ex. 31.)  Plaintiff testified that, based

on her comparison of Dignity sales materials with her program, Dignity was a "well-done re-

engineering of the Millennium Funeral Concepts package concept."  (Def. Ex. R at 118.)

## III.  DISCUSSION

Plaintiff alleges claims of fraud, mistaken or innocent misrepresentation, breach of

contract, misappropriation of trade secrets, and unjust enrichment.  (Doc. 78.)  Defendants

contend that all claims against defendant SCI are due to be dismissed for lack of service, and

that all claims against both defendants are due to be dismissed because "there is no genuine issue of material fact, and Defendants are entitled to judgment as a matter of law." (Doc. 93.)

## A.  SERVICE OF A SUMMONS ON SCI

Defendant SCI contends that all claims against it are due to be dismissed because it was never served a summons and complaint in this case.  The court notes that plaintiff did not serve a summons and complaint on defendant SCI when she amended her Complaint to add SCI as a defendant.  (*See* doc. 36.)  Nevertheless, defendant SCI did file an answer to plaintiff's Amended Complaint. (Doc. 90.)  In this Answer, it asserts the affirmative defense of failure of service, (doc. 90, Thirty-ninth Defense); defendant SCI of Alabama asserted the same defense in its Answer to plaintiff's original Complaint, (doc. 4, Thirty-ninth Defense). SCI never moved the court to dismiss the claims against it on the basis of insufficient service. It has appeared through counsel, (*see* doc. 86), and opposed plaintiff's Motion to Impose Sanctions on Defendant SCI for Failure to Comply with Court Orders, (*see* doc. 88).

The Eleventh Circuit has held that Fed. R. Civ. P 4(m) "grants discretion to the district court to extend the time for service of process even in the absence of a showing of good cause." *Horenkamp v. Van Winkle and Co., Inc.*, 402 F.3d 1129, 11323 (11th Cir. 2005). In this case, defendant SCI never moved the court to dismiss the claims against it and fully participated in these proceedings.  Because SCI has been a full and active participant in this

case, the court finds no reason that it should not exercise its discretion and extend the time for plaintiff to properly serve defendant.

The Supreme Court has held:

> Service of process, we have come to understand, is properly regarded as a matter discrete from a court's jurisdiction to adjudicate a controversy of a particular kind, or against a particular individual or entity.  Its essential purpose is auxiliary, a purpose distinct from the substantive matters aired in the precedent on which the dissent, wrenching cases from context, extensively relies – who may sue, on what claims, for what relief, within what limitations period.   Instead, the core function of service is to supply notice of the pendency of a legal action, in a manner and at a time that affords the defendant *a fair opportunity to answer the complaint and present defenses and objections*.

*Henderson v. United States*,  517 U.S. 654, 671-672 (1996)(footnotes omitted; emphasis added).  SCI has had notice of the pendency of this action and has had a fair opportunity, and actually has, presented its defenses and objections to the substantive issues presented.  No prejudice will inure to SCI if the court allows plaintiff to perfect service.

Therefore, the court will deny defendants' Motion for Summary Judgment on the ground that plaintiff failed to properly serve defendant SCI and will allow plaintiff additional time to perfect service upon SCI.

## B. FRAUD AND MISREPRESENTATION

### 1.  Statute of Limitations

Defendants contend that plaintiff knew or should have known about the Dignity program more than two years before she filed this action based upon a newsletter published in October 1999; therefore, her fraud and misrepresentation claims are time barred.  Plaintiff

denies learning about the alleged fraud prior to leaving SCI of Alabama.  (*See* Def. Ex. R at 114-15.)  Whether plaintiff saw the newsletter and whether the newsletter was sufficient to inform plaintiff that Shipley and March were not going to roll out her MFC program as she alleges they had promised are issues of fact that cannot be resolved on Motion for Summary Judgment.  Therefore, defendants' Motion for Summary Judgment is due to be denied.

### 2.  Merits of the Fraud Claims

Plaintiff's Complaint, as amended, alleges two counts of fraud – Count Three, which alleges defendants are "guilty of deceit and/or willful misrepresentation and/or reckless misrepresentation and/or suppression," (doc. 78 ¶ 48), and Count Four, which alleges defendants "Negligently, mistakenly or innocently misrepresented facts," (*id*. ¶ 50.) According to plaintiff, "Shipley represented to [her] that her MFC programs would be rolled out in Milton, Florida, and beyond, if she would take a job in Milton to first learn the SCI system.  (Doc. 147 at 31 (citing Def. Ex. R at 51-52; Def. Ex. Z at 47).)  She further claims that March told her "that her programs would be rolled out nationwide if she would take the Area Sales Director job in Birmingham.  (*Id*. (citing Pl. Ex. 6 ¶¶ 32-33).)  These representations concern defendants' promises to take future action.  Therefore, plaintiff has the burden of proving promissory fraud under Alabama law.

Alabama law provides:

> To establish a cause of action for promissory fraud, the plaintiff must prove: (1) that the defendant made a false representation of a material fact; (2) that the false representation was relied upon by the plaintiff; (3) that the plaintiff was damaged as a proximate result of the reliance; (4) that the representation was

made with a present intent to deceive; and (5) that when the representation was made the defendant intended not to perform in accordance with it.

*Howard v. Wolff Broadcasting Corp.*, 611 So.2d 307, 311 (Ala. 1992)(citing *Leisure American Resorts, Inc. v. Knutilla*, 547 So.2d 424, 426 (Ala.1986)).

The court notes that Alabama law requires proof of a specific intent to deceive in promissory fraud cases:

> In cases of misrepresentation of **existing** facts, a reckless misrepresentation might constitute fraud. The rule is different where the alleged representation relates to some future event . . . . In such a situation, the law requires, in addition to the normal elements of falsity, reliance and damage, proof that, at the time the statement or promise about the future was made, there was an **actual fraudulent intent** not to perform the act promised and an **intent to deceive** the plaintiff.

*Kennedy Elec. Co., Inc. v. Moore-Handley, Inc.*, 437 So.2d 76, 80 (Ala. 1983)(citations omitted), *cited in National Sec. Ins. Co. v. Donaldson*, 664 So.2d 871, 876 (Ala. 1995). Thus, apparently, Alabama does not recognize a cause of action for negligent or innocent promissory fraud; therefore, Count Four of plaintiff's Complaint is due to be dismissed.

In their Brief in Support of Motion for Summary Judgment, defendants contend that plaintiff's fraud claims are due to be dismissed because "at least some of the representations she now claims were false were, in fact, not false," (doc. 94 at 11), and because "[p]laintiff failed to offer any testimony as to how her actions changed as a result of any purported misrepresentations," (*id*. at 12).[6]

---

[6]Because defendants do not challenge any of the other elements of plaintiff's promissory fraud claim, the court assumes, for purposes of deciding defendants' Motion for

### a.  False Promise

Defendants argue that Shipley's and March's promises about rolling out her program beyond Milton, Florida cannot be "false" because, as plaintiff contends, defendants did roll her program out, only it was re-engineered and presented as Dignity.  (*Id*. at 11-12.) Specifically, defendants argue:

> With regard to purported representations as to implementation of the MFC program beyond Memory Park, Plaintiff's testimony about her re-engineering claim, raised as part of her breach of contract claim, is that Defendants re-engineered and implemented her program nationwide, under the guise of Dignity Memorial.  (Exhibit R at 98-100.)  Plaintiff identified the Dignity Memorial program as "virtually identical" to her MFC program, so that the nationwide rollout of Dignity Memorial was a nationwide rollout of her MFC program.  (Exhibit I at 11).  For Plaintiff to prevail on her re-engineering claim, Plaintiff cannot claim that Shipley and/or March lied to her when they promised to roll out her MFC program beyond Memory Park. Plaintiff cannot have it both ways.

(*Id*.)  Defendants' argument is mere sophistry.

First, the court notes that a party may plead inconsistent facts and pursue alternative theories of recovery.  *Allstate Ins. Co. v. James*, 779 F.2d 1536, 1540-41 (11th Cir. 1986)(citing Fed. R. Civ. P. 8(e)(2); *Brookhaven Landscape v. J. F. Barton Contracting*, 676 F.2d 516, 523 (11th Cir. 1982)).  Second, plaintiff's allegations that Dignity was produced by re-engineering her MFC program is not inconsistent with her promissory fraud claims.

---

Summary Judgment only, that plaintiff can prove defendants made promises to her with intent to deceive and that at the time the promises were made, defendants did not intend to perform.

Plaintiff alleges that defendants promised to use her program and also promised to pay her for that use. Defendants do not concede that the Dignity program was a re-engineered version of plaintiff's MFC program.  Moreover, defendant did not compensate plaintiff for use of her program beyond Milton, Florida.  Therefore, assuming for purposes of summary judgment that defendants promised plaintiff they would use her MFC program, plaintiff has established that such promises were false.[7]

Defendants' Motion for Summary Judgment as to plaintiff's fraud claims based on a lack of proof of a false statement is due to be denied.

**b. Reliance**

Defendants contend that plaintiff cannot establish her claim of promissory fraud based on the promises of Shipley and March because she has no evidence "as to how her actions changed as a result of any purported misrepresentation."  (Doc. 94 at 12.)  They state, "Plaintiff has not pointed to a single action she undertook or failed to undertake in reliance on any representation regarding her MFC program, thus defeating her fraud and promissory estoppel claims."  (*Id*. at 13.)  However, the court notes that plaintiff has "pointed to" two

---

[7]The court notes that, if successful, plaintiff would be entitled "recover damages proximately resulting from [her] reliance upon the false representation," and "'expenses incurred as a result of fraudulent misrepresentation.'"  *Ex parte Hurricane Freddy's, Inc.*, 861 So. 2d 1075, 1077 (Ala. 2002)(quoting C. Gamble and D. Corley, ALABAMA LAW OF DAMAGES §§ 17-1, 36-32 (1982); citing *Patel v. Hanna*, 525 So. 2d 1359, 1360 (Ala. 1988); *Marshall Durbin Farms, Inc. v. Landers*, 470 So. 2d 1098, 1102 (Ala. 1985)).  However, the court reserves the issue of the measure of damages to which plaintiff would not be entitled if successful.

distinct actions she took in reliance upon defendants' promises: (1) her acceptance of employment at the Milton, Florida funeral home, (doc. 78 ¶¶ 17-18; Def. Ex. R at 51-52), and (2) her acceptance of an Area Sales Director position in Birmingham, (doc. 78. ¶¶ 22-23, 33-34, 36; Def. Ex. R at 64-65, 94).

Plaintiff's actions of taking a position in Milton and, later, moving to Birmingham are sufficient to support a finding that plaintiff reasonably relied upon the alleged promises of Shipley and March. *See Beiersdoerfer v. Hilb, Rogal and Hamilton Co.*, Nos. 1012243 and 1012304, 2005 WL 32403, *8 (Ala. Jan. 7, 2005)("[Plaintiff's] testimony that he subleased office space at a new location and relocated his office there in reliance on the representations of [defendants] constitutes substantial evidence that [plaintiff] relied upon those representations."); *see also Kidder v. AmSouth Bank, N.A.*, 639 So. 2d 1361, 1362-63 (Ala. 1994)(citing *Smith v. Reynolds Metals Co.*, 497 So. 2d 93 (Ala.1986)).

The court finds that defendants' Motion for Summary Judgment as to plaintiff's fraud claims on the basis of a lack of reliance is due to be denied. Because there are disputed issues of fact and defendants have not shown that they are entitled to judgment as a matter of law, defendants' Motion for Summary Judgment as to plaintiff's fraud claims is due to be denied.

22

## C. BREACH OF CONTRACT

### 1. The Milton Contract

Plaintiff's Complaint, as amended, alleges that she had a contract with SCI "to purchase products from the Plaintiff and to utilize Plaintiff's sales programs." (Doc. 78 ¶ 19.) She alleges that this contract was for "the purchase of Plaintiff's programs in Milton, Florida; Pensacola, Florida; Mobile, Alabama and throughout SCI nationwide." (*Id*. ¶ 37.) She contends that defendants "failed to implement [her] programs and thereby breached the existing contract . . . ." (*Id*. ¶ 39.)

> The Milton contract states:
>
> It is mutually agreed that the [MFC] Programs will initially be set up in Memory Park, Milton, Florida. Within 60 days, Service Corporation International **will contract** with [MFC] to place "The Programs" into all Pensacola, Florida Locations – within 120 days, all Mobile, Alabama Locations – within 180 days, it is mutually agreed, that [MFC] programs will be given an opportunity to be presented to the Corporate Headquarters for consideration as a company wide Marketing Plan.

(Def. Ex. A at 3 (emphasis added; original emphasis deleted).) The contract also provides that SCI "may not reverse engineer, decompose, recompile, disassemble, reassemble or in any way restructure 'The Program' except and only to the extent that such activity is expressly permitted by applicable law not withstanding [sic] this limitation." (*Id*. at 1.) With regard to the Milton contract, plaintiff alleges that (1) SCI breached their agreement to roll out plaintiff's MFC programs in Pensacola and Mobile, and (2) that defendants re-engineered

23

and/or restructured the MFC program or parts of that program without her express permission in violation of the Milton contract.

### a.  MFC in Pensacola and Mobile

Plaintiff contends that the language quoted above from the Milton contract constitutes a contract between her and SCI for the implementation of the MFC program in Pensacola, Florida, and Mobile, Alabama.  (Doc. 147 at 28.)  Defendants argue that this language in the Milton contract is a mere "agreement to agree," which is not enforceable.  (Doc. 321 at 6.)

The Milton contract specifies that Florida law applies.  (Def. Ex. A at 3.)  Florida law provides that an agreement is not enforceable "where the record establishes that it is the intent of the parties that further action be taken prior to the completion of a binding agreement."  *Williams v. Ingram*, 605 So. 2d 890, 893 (Fla. App. 1992)(citing *Albert v. Hoffman Elec. Constr. Co.*, 438 So. 2d 1015 (Fla. App. 1983)).  "To be enforceable, an agreement must be sufficiently specific, and reflect assent by the parties to all essential terms. Where essential terms of an agreement remain open, subject to future negotiation, there can be no enforceable contract."  *Bergman v. DeIulio*,  826 So. 2d 500, 503 (Fla. App. 2002)(quoting *Suggs v. Defranco's, Inc.*, 626 So. 2d 1100, 1100 (Fla. App. 1993))(internal quotations omitted); *see also Gowni v. BP Corp. North America, Inc.*, No. 6:01CV1405-ORL-28KRS, 2003 WL 24051561, *6 (M.D. Fla. May 9, 2003)(quoting *Bergman*).

The Milton contract states that SCI and MFC "will contract" for the placement of the MFC program in Pensacola and Mobile.  It does not state that SCI and MFC will enter into identical EULA ["end user licensing agreement"] for the entire Pensacola area and the Mobile area.  The court finds that the language "will contract" is unambiguous.  "Contract interpretation is generally a question of law for the court, rather than a question of fact.  Unless ambiguous, contract language must be given its plain meaning.

Plaintiff contends that she "carefully drafted the executed Contract and it was understood that the same terms which governed it would govern the additional locations . . . . (Doc. 147 at 29 (citing Pl. Ex. 6 ¶ 23).)  The court disagrees.  The word "contract" when used as a verb, as in the Milton contract, means to "to establish or undertake by contract."  Merriam-Webster Online at <<http://www.m-w.com/cgi-bin/dictionary>>.  Therefore, as used in the Milton contract, the phrase "will contract" means that SCI and plaintiff agreed to enter into a contract in the future regarding the licensing of the MFC program to SCI in Pensacola and Mobile.  The terms of such future agreements are not defined in the Milton contract as the same terms as the EULA for Milton.   Indeed, the record contains evidence that plaintiff presented a "Proposal" for the implementation of her programs in Pensacola that contained significantly different terms than those contained in the Milton contract.  (*Compare* Def. Ex. A *with* Def. Ex. H.)  The court finds that this evidence rebuts plaintiff's argument that the parties agreed that the terms of any future contract for Pensacola and Mobile were to be identical to the Milton contract.

The court finds that the language in the Milton contract regarding Pensacola and Mobile indicates an agreement to contract in the future, the terms of which were not defined; therefore, such agreement is not enforceable. *Bergman*, 826 So. 2d at 503. Defendants' Motion for Summary Judgment as to this claim is due to be granted.

### b.  Re-engineering and/or Restructuring Claim

Plaintiff alleges that the Dignity program is a restructured MFC program in violation of the Milton contract. She bases her claim on the fact that the ***concept*** of the MFC packages was innovative and had not been used in the funeral industry before she developed the MFC program; MFC program and Dignity program are identical in certain respects; SCI had access to MFC before the development of Dignity; and Poynter, a SCI manager, allegedly suggested SCI just steal the MFC program.

Plaintiff contends that MFC program is an "innovative" concept of packaging goods and services with a bottom-line price, and that the concepts of the Dignity program and her MFC program were the same. (Doc. 147 at 20, 22.) She contends, "[P]rior to Dignity, sales counselors made presentations from what is known as a general price list ("GPL") and presented goods and services on an individual a la carte basis." (*Id.* at 21.) The MFC program and the Dignity program were "standardized company-wide packaging plans." (*Id.* at 24.) In addition to her claims that Dignity and MFC were identical in concept, plaintiff complains that "the two programs are also remarkably similar in actual physical design – that is the actual marketing materials themselves are substantially similar." (*Id.*) She also

complains that the programs were identical because they had separate packages for cremations and a funeral.  (*Id.* at 25.)

Notwithstanding plaintiff's contentions to the contrary, the "concept" of funeral packages was not innovative.  *See* 47 Fed. Reg. 42260, 42267.  Moreover, the terms of the Milton contract do not protect the "concept."

In the Milton contract, SCI agreed not to restructure "The Program."  (Def. Ex. A at 1.)  "The Program" is defined by its contents; the Milton contract states:

> THIS [MFC] END-USER LICENSE AGREEMENT . . . IS A LEGAL AGREEMENT BETWEEN YOU . . . AND [MFC] FOR THE [MFC] PROGRAMS WHICH INCLUDES RETAIL CLOSING BOOKS . . . , SALES CATALOGS, COUNSELOR HANDBOOKS, SALES JOURNALS, SUPPORT DOCUMENTS, TRAINING MANUALS, PRINTED MATERIALS, ASSOCIATED MEDIA, VIDEOS, COMPUTER SOFTWARE & ALL OTHER [MFC] COPYRIGHTED MATERIALS OR MEDIA ("The Program.").

(*Id.*)  The plain terms of the Milton contract protect the component parts of the MFC program, not the idea or "concept" of standardized company-wide package plans.  Therefore, any breach-of-contract claim based on reengineering or restructuring of the MFC program must be based on defendant's reengineering or restructuring of one or more of the component parts that comprise the MFC program, as defined in the Milton contract, and not the use of the "concept."  The court finds that plaintiff has no breach of contract claim against defendant SCI based on its use of the "concept" of standardized company-wide packaging.

Moreover, even if this court assumes the Dignity package documents and the MFC package documents were similar, the court finds that plaintiff has not demonstrated

substantial evidence that this similarity was the result of defendants' restructuring or re-engineering of her MFC materials.  Defendants have presented evidence that Dignity was developed by a team of SCI employees, who, with one exception, testified they had never heard of plaintiff or MFC and that they did not rely on any of the MFC materials in developing Dignity.  Plaintiff has presented no evidence to rebut this evidence of defendants. March, the only member of the Dignity development team who had any contact with plaintiff and/or her MFC material, did not meet plaintiff or see her MFC material until September 1999.  The concept of the Dignity packages and branding was substantially completed by July 1999, (*see* Def. Exs. N and O), and the program was test marketed less than one month after plaintiff met with March, (Def. Ex. K).  Evidence that plaintiff met with March in September 1999, presented her MFC program to him, and left him some documents is not substantial evidence to allow a reasonable jury to infer that defendants took the information March had and used it in the development of the Dignity program as alleged by plaintiff, given the history of the development of the Dignity concept before plaintiff met March and the relatively short time between plaintiff's visit to Houston and the test marketing of Dignity in October 1999.

The court finds that plaintiff has not presented evidence sufficient to allow a reasonable jury to find that defendants restructured or re-engineered one or more of the component parts of her MFC program for use in the development of the Dignity program in violation of the terms of the Milton contract.  Therefore, the court finds that defendant's

Motion for Summary Judgment is due to be granted as to plaintiff's breach of contract claim related to the Milton contract.

**2.  Oral Contract for the Time Capsule Program**

Plaintiff alleges that she had an oral contract with SCI for her time capsule program, "formed by a telephone call with Mike Shipley," and based on a proposal that was faxed to Shipley in the fall of 2000.  (Doc. 147 at 30; doc. 119 at 142, 147-49.)  She contends that the parties had agreed on the price and had established a roll out date for the time capsule program.  (*Id.*)  However, she testified that she was never presented a written agreement and that she and Shipley were continuing to negotiate.  (Ex. R at 115, 151-52.)  Shipley testified that he never had a firm agreement with plaintiff for a time capsule program and that he would not have executed such an agreement as SCI had withdrawn all money for lead procurement programs.  (*See* Def. Ex. Z at 221.)  In her resignation letter, she states that Shipley told her there would be no contract for the time capsules; she did not state that she and Shipley had a contract for the time capsule program.  (Pl. Ex. 20 at 2.)

In Alabama, plaintiff "bear[s] the burden, peculiar to any action involving an alleged oral agreement, of proving the *terms* of the alleged agreement."  *See Marshall Durbin Farms, Inc. v. Fuller*, 794 So.2d 320, 324 (Ala. 2000)(emphasis in original).  The court finds that plaintiff has not produced any evidence regarding the terms of the October proposal that she alleges Shipley accepted to form the oral contract.  Although the record contains plaintiff's May 2000 proposal for a contract regarding the time capsule program and some

undated additional marketing materials, it does not contain any evidence of the actual terms of the oral agreement, which plaintiff testified were contained in a proposal faxed to Shipley in the fall of 2000.  Because plaintiff has not produced evidence of the definite terms of the alleged agreement, her claims based on the oral contract for the sale of her time capsule program are due to be dismissed.[8]

## D.  MISAPPROPRIATION OF TRADE SECRETS

Plaintiff alleges that defendants misappropriated her trade secrets "[b]y using, marketing, or selling [her] programs . . . ."  (Doc. 78 ¶¶ 58-59.)  In her Memorandum in Opposition to Defendants' Motion for Summary Judgment, plaintiff "stipulate[s] to the dismissal of her claims for Misappropriation of Trade Secrets."  (Doc. 147 at 38.)  Therefore, without objection, plaintiff's claim of misappropriation of trade secrets will be dismissed.

---

[8]The court notes that defendants contend that plaintiff's claims based on this oral contract are barred by the Statute of Frauds because the agreement cannot "be performed within one year of [its] making."  Ala. Code § 8-9-2(1).  Defendants argue that because the vault in which the time capsules are placed will not be opened for 25 years, the contract is void under the Statute of Frauds.  The terms of the agreement, however, provide for the licensing of the program and the sale of the time capsules.  Although, according to the terms of the program SCI will have agreements with the purchasers of the time capsules to open the vaults and remove the time capsules in 25 years, this was not an obligation in the agreement between MFC and SCI.

Nevertheless, the court notes that plaintiff's claims based on the oral contract are barred by Ala. Code § 7-2-201(1), which requires "a contract for the sale of goods for the price of $500 or more" must be in writing to be enforceable.  Plaintiff's May 2000 proposal indicates that she was to provide the actual time capsules to SCI for a total cost of $13,750.  Therefore, even if plaintiff had proven she had an oral contract with SCI for her time capsule program, such contract would be barred as it is not in writing as required by Ala. Code § 7-2-201(1).

### E.  UNJUST ENRICHMENT

Under Alabama law –

To prevail on a claim of unjust enrichment, the plaintiff must show that the defendant holds money which, in *equity and good conscience*, belongs to the plaintiff or holds money which was improperly paid to defendant because of *mistake or fraud*.  The doctrine of unjust enrichment is an old *equitable* remedy permitting the court in equity and good conscience to disallow one to be unjustly enriched at the expense of another.

*Avis Rent A Car Systems, Inc. v. Heilman*, 876 So.2d 1111, 1122-23 (Ala. 2003)(emphasis in original, internal citations and quotations omitted).  "In order to substantiate a claim of unjust enrichment under Alabama law, a plaintiff may show that [(1)] the donor of the benefit acted under a mistake of fact or in misreliance on a right or duty, or (2) the recipient of the benefit engaged in some unconscionable conduct, such as fraud, coercion, or abuse of a confidential relationship."  *Morrow v. Green Tree Servicing, L.L.C.*, 360 F. Supp. 2d 1246, 1251 n.13 (M.D. Ala. 2005)(internal quotations and citations omitted).

In her brief, plaintiff apparently argues that she has two grounds for her unjust enrichment claim: (1) she seeks damages for defendants' breach of the re-engineering claim in the Milton contract, which defendant contends was not signed by an authorized agent of SCI, and (2) she seeks damages based on SCI's "fraud and coercion in attempting to misappropriate the Plaintiff's MFC Program."  (Doc. 147 at 35.)

For the reasons set forth above, the court finds that plaintiff does not have a cause of action based on the re-engineering or misappropriation of her MFC program.  Therefore, plaintiff's claims of unjust enrichment are due to be dismissed.

## **CONCLUSION**

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to plaintiff's innocent or negligent fraud claim, breach of contract claims, misappropriation of trade secrets claim, and unjust enrichment claims.  The court finds that there are material issues of fact as to plaintiff's intentional fraud claim; therefore, defendant's Motion for Summary Judgment as to that claim is due to be denied.  An Order granting in part and denying in part defendants' Motion for Summary Judgment will be entered contemporaneously with this Memorandum Opinion.

Also, an Order allowing plaintiff 30 days to serve defendant SCI with a summons and Complaint will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this 27th day of March, 2006.

*Sharon Lovelace Blackburn*
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE